UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| ZUP'S OF BABBITT-AURORA, INC., and SECURITY NATIONAL INSURANCE CO., INC., | Case No. 12-CV-3084 (PJS/LIB) |
| Plaintiffs, | ORDER |
| v. | |
| WEST BEND MUTUAL INSURANCE CO., INC., | |
| Defendant. | |

---

Jeffrey W. Gunn, MORRIS & STELLA; Hilary J. Loynes and David C. Linder, LARSON KING, LLP, for plaintiffs.

Kevin J. Kennedy and Forrest G. Hopper, BORGELT, POWELL, PETERSON & FRAUEN S.C., for defendant.

Plaintiff Zup's of Babbitt-Aurora, Inc. ("ZBA") owns a strip mall in Babbitt, Minnesota. ZBA operates a grocery store in part of the strip mall and leases the remaining space to various tenants. A fire destroyed the strip mall on September 24, 2011. As a result, ZBA suffered three types of losses: (1) property damage to the strip mall itself; (2) lost rental income from the tenants; and (3) lost business income from the grocery store. The strip mall was eventually rebuilt.

At the time of the fire, ZBA was insured by both Security National Insurance Co., Inc. ("Security National") and West Bend Mutual Insurance Co., Inc. ("West Bend"). West Bend concedes that its policy covers the first two categories of losses (the property damage to the strip mall and the lost rental income), and Security National concedes that its policy covers the third category of losses (the lost grocery income). The question in this lawsuit is whether the lost

grocery income is *also* covered by West Bend's policy. ZBA has no dog in this fight; the dispute is between the two insurers.

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons that follow, the Court finds that, although West Bend does indeed cover the lost grocery income, its coverage is excess to Security National's — and, because the liability limits of the Security National policy have not been exhausted, West Bend is not liable to ZBA. Accordingly, West Bend's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is (mostly) denied.[1]

## I. BACKGROUND

Zupancich Bros. Inc.[2] ("Zupancich Brothers") owns and operates six grocery stores in northeastern Minnesota through ZBA and other wholly-owned subsidiaries. *See* Fifth Kennedy Aff. Ex. B at 1 [ECF No. 66-2]. ZBA owns and operates the grocery store in Babbitt. As noted, the grocery store occupies part of a strip mall that is owned by ZBA. *See* Edward Zupancich Dep. 15-18 [ECF No. 60-1]. The remainder of the strip mall is leased to various tenants. *Id.* at 28-29. As also noted, the strip mall — including the grocery store — was largely destroyed by fire on September 24, 2011. *See* Compl. ¶ 24. At the time, the strip mall and the grocery store were covered under two separate insurance policies.

---

[1]West Bend's claim for reformation is pleaded in its amended counterclaim. *See* ECF No. 21. Because the Court rejects that claim, plaintiffs' motion for summary judgment is granted with respect to the amended counterclaim. Plaintiffs' motion is denied, however, with respect to the claims pleaded in their complaint.

[2]The complaint refers to this entity as "Zupancich Brothers, Inc.," *see* Compl. ¶ 8 [ECF No. 1], but the business name registered with the Minnesota Secretary of State is in fact "Zupancich Bros. Inc.," *see* Fifth Kennedy Aff. Ex. C at 1 [ECF No. 66-3].

First, Zupancich Brothers purchased a policy from Security National covering the operations of the six grocery stores that it owns, including the grocery store in Babbitt. *See* Linder Decl. Ex. H ("Security National Policy") [ECF No. 60-8]. ZBA is an additional named insured under that policy. *Id.* at 63. The policy provides (among other things) that Security National "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations'" at the Babbitt grocery store. *Id.* at 201. The parties agree that the Security National policy covers the lost grocery income suffered as a result of the fire. The Security National policy also provides property coverage for damage to the buildings in which four of the six grocery stores were located; the Babbitt strip mall is not one of those four buildings. *Id.* at 55.

Second, ZBA purchased an insurance policy from West Bend that provides (among other things) property coverage for the Babbitt strip mall, as well as property coverage for other ZBA-owned buildings near the strip mall. *See* Linder Decl. Ex. I ("West Bend Policy") [ECF No. 60-9]. The West Bend policy also provides that West Bend "will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' . . . ." *Id.* at 22. The parties agree that this provision of the West Bend policy covers the lost rental income suffered by ZBA a result of the fire. What the parties dispute is whether this provision also covers the lost grocery income.

Shortly after the fire, ZBA filed claims with both West Bend and Security National. From West Bend, ZBA sought coverage for only the damage to the strip mall and the lost rental income; ZBA did not claim that West Bend was liable for the lost grocery income. West Bend eventually paid approximately $1.4 million to ZBA on its claim. *See* Rykken Dep. 169-70 [ECF

No. 60-5]. ZBA sought coverage for the lost grocery income from Security National. After a forensic accounting, Security National assessed the amount of that lost grocery income as $310,966.50. *See* ECF No. 1-5.

In the course of processing ZBA's claim, Security National learned of the West Bend policy, reviewed it, and concluded that it also covered the lost grocery income. *Id.* Security National then entered into a loan-receipt agreement with ZBA, under which Security National agreed to pay the entire amount of the lost grocery income, including the portion that it contended was West Bend's responsibility. In return, ZBA essentially agreed that it would bring this action against West Bend, and that Security National (which is also a plaintiff) would be entitled to any recovery.

West Bend now argues that, for three reasons, it has no duty to indemnify ZBA for the lost grocery income:

First, West Bend argues that its policy does not cover lost grocery income. West Bend relies almost entirely on the fact that the phrase "Lessor's Risk Only" appears on the policy's declarations page. *See* West Bend Policy at 6. This phrase, argues West Bend, makes it clear that the only business income covered under the policy is business income that ZBA earns as a *lessor* — i.e., rental income paid by tenants of the strip mall.

Second, West Bend argues that if its policy is interpreted to also cover grocery income, then that additional coverage reflects a mutual mistake of the parties, and the Court should reform the policy to exclude the coverage. According to West Bend, the broker who applied for the policy on ZBA's behalf did not mention on the application that ZBA operated a grocery store in the strip mall. Instead, the broker told West Bend that ZBA leased all of the space in the strip

mall to others — i.e., that the only income earned by ZBA in connection with the strip mall was rental income.  *See* Fifth Kennedy Aff. Ex. J at 9 [ECF No. 66-10].  Citing this evidence, West Bend argues that ZBA intended to procure — and West Bend intended to provide — coverage of only ZBA's rental income, not its grocery income.  West Bend contends that the policy should be reformed to reflect the true intent of the parties.

Finally, West Bend argues that if its policy is interpreted to cover lost grocery income, and if the policy is not reformed, then West Bend is still not liable to ZBA.  It is undisputed that Security National's policy also covers lost grocery income, and both the Security National and West Bend policies contain "other insurance" clauses that exclude coverage when another insurance policy covers the same loss.  Under Minnesota law, when the other-insurance clauses of two insurance policies conflict, the "coverages of a given risk shall be 'stacked' for payment in the order of their closeness to the risk."  *Auto Owners Ins. Co. v. Northstar Mut. Ins. Co.*, 281 N.W.2d 700, 703 (Minn. 1979) (quotation omitted).  West Bend argues that Security National's policy is closer to the risk, and thus that Security National's coverage is primary and West Bend's coverage is excess.  Because ZBA's claim for lost grocery income does not exhaust the liability limits of the Security National policy, West Bend contends that it has no obligation to indemnify ZBA for any part of that loss.

The Court will address these arguments in turn.

## II.  ANALYSIS

### A. *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id*. at 255.

### B.  *Scope of Coverage*

The West Bend policy provides that West Bend "will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' . . . ."  West Bend Policy at 22.  The policy does not define "operations" or limit the term to operations as a lessor.  On its face, then, the policy clearly covers ZBA for "the actual loss of Business Income" that ZBA sustains "due to the necessary suspension" of all of its "operations," including its grocery-store operations.

West Bend notes, however, that the label "Lessor's Risk Only" appears on the declarations page.  *See* West Bend Policy at 6.  According to West Bend, this phrase limits the policy's business-income coverage to ZBA's operations as a lessor — that is, to lost rents from tenants.  ZBA's operations as a lessor do not include operating a grocery store, says West Bend, and so lost grocery income is not covered under the policy.

West Bend reads far too much into a single nebulous, undefined phrase that appears — without explanation or elaboration (or even a verb) — on the declarations page of the policy.  Nothing about the words "Lessor's Risk Only" necessarily limits coverage in the way that West Bend suggests; after all, ZBA was the "lessor" referred to in the policy, and one of the "risks" that it faced if its strip mall burned was the loss of grocery income.  Moreover, the argument of

West Bend's lawyers is directly contradicted by the testimony of West Bend itself. West Bend's Rule 30(b)(6) representative testified that the phrase "Lessor's Risk Only" did *not* limit coverage under the policy, but instead was merely a rating classification used for underwriting purposes. *See* Hall Dep. 8, 32 [ECF No. 60-6]. In other words, the inclusion of "Lessor's Risk Only" on the declarations page reflected the subjective understanding of West Bend's underwriter that ZBA leased all of the space in the strip mall to others, and the underwriter priced the policy accordingly. But coverage depends on the words used in the policy, not on the subjective understanding of the policy's underwriter about the nature of the insured's operations. *Cf. Feurzeig v. Ins. Co. of the W.*, 59 Cal. App. 4th 1276, 1287 (Cal. Ct. App. 1997) ("[T]he Lessor's Risk Only language does not create a limitation on coverage.").

In short, the West Bend policy unambiguously covers the loss of business income that ZBA suffers on account of the suspension of the "operations" that it conducts in connection with the strip mall, including its grocery-store operations.[3] Accordingly, the Court finds that West Bend's policy provides coverage for the grocery income that ZBA lost as a result of the fire.

---

[3]Ambiguities in an insurance policy "are generally resolved in favor of the insured." *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880 (Minn. 2002) (quotation omitted). As a result, even if inclusion of the phrase "Lessor's Risk Only" on the declarations page created an ambiguity about the scope of the business-income coverage, that ambiguity would be resolved in favor of ZBA and against West Bend. The recent (and, in this Court's view, questionable) pronouncement of the Minnesota Court of Appeals that "*contra proferentem* does not apply in a coverage suit between insurers" does not apply in this case, as ZBA is a party to this lawsuit. *Economy Premier Assur. Co. v. W. Nat. Mut. Ins. Co.*, 839 N.W.2d 749, 756 (Minn. Ct. App. 2013).

### C. Reformation

West Bend next argues that if, as the Court has held, its policy covers lost grocery income, then the inclusion of that coverage in the policy was the result of a mutual mistake. According to West Bend, both parties to the insurance contract intended that the policy *not* cover grocery income. West Bend asks that the policy be reformed to reflect this mutual understanding.

"A party seeking reformation must prove that: '(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties . . . .'" *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011) (quoting *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980)). The party seeking reformation "must establish these elements through 'evidence which is clear and consistent, unequivocal and convincing.'" *Id*. "This is a very narrow doctrine that is often invoked but rarely successful." *BFI Waste Sys. of North Am. LLC v. Freeway Transfer, Inc.*, 867 F. Supp. 2d 1037, 1046 (D. Minn. 2012).

Reformation is not warranted in this case. The Court will assume, for the sake of argument, that West Bend affirmatively intended *not* to cover lost grocery income. But there is no evidence that ZBA had a similar intention. In arguing to the contrary, West Bend relies primarily on testimony of employees of the broker who placed the coverage that *they* were not seeking coverage of ZBA's grocery income from West Bend. *See* Rykken Dep. 39-40; Craig Dep. 149 [ECF No. 60-4]. But under Minnesota law, a broker "is at all times the agent of the insurer and not the insured." Minn. Stat. § 60K.49, subd. 1; *see also* Minn. Stat. § 65A.14

("Every person who solicits insurance and procures an application therefor shall be held to be the agent of the party afterward issuing insurance thereon or a renewal thereof.").

Hence, it is immaterial that the *broker* did not intend to purchase coverage for lost grocery income; that is nothing more than (cumulative) evidence of West Bend's own intent. What West Bend needs is evidence that *ZBA* did not intend that the West Bend policy cover lost grocery income. The evidence in the record about ZBA's intent is, however, far from "clear and consistent, unequivocal and convincing." *SCI Minn. Funeral Servs.*, 795 N.W.2d at 865 (quotation omitted). The agent of ZBA who interacted with the broker testified, in essence, that he provided the broker with the expiring policy and simply asked if the broker could find coverage that was as good or better for a lower price. *See* Edward Zupancich Dep. 21-22. Thus, the only evidence in the record about ZBA's intent is evidence that ZBA wanted to pay less money for coverage that was equal to *or broader than* its expiring policy — a policy that appears to have *covered* lost grocery income.[4] Because there is no evidence that both parties to the West Bend policy intended that the policy not cover lost grocery income,[5] plaintiffs' motion for summary judgment on West Bend's reformation claim is granted, and West Bend's amended counterclaim is dismissed.

---

[4]At oral argument, West Bend represented that the expiring policy was substantially identical to the West Bend policy. The Court has found that the West Bend policy provides coverage for lost grocery income. If West Bend is correct, then, the expiring policy also provided coverage for lost grocery income.

[5]West Bend could succeed on its reformation claim without evidence of a *mutual* mistake if it could prove that there was a "*unilateral* mistake accompanied by fraud or inequitable conduct by the other party." *SCI Minn. Funeral Servs.*, 795 N.W.2d at 865 (emphasis added and quotation omitted). But West Bend does not allege that ZBA procured the insurance policy through fraud or inequitable conduct.

*D. Closeness to the Risk and Total Policy Insuring Intent*

The Court has found that the West Bend policy provides coverage for the grocery income that ZBA lost as a result of the fire. Security National's policy covers the same loss. Both policies include "other insurance" clauses that exclude payment for a loss if another policy covers the same loss. *See* ECF No. 70 at 12 n.4. Thus it is impossible to order one company to indemnify ZBA for its lost grocery income "without violating the other-insurance clause of [that] company . . . ." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 587 (Minn. 2003) (quotation omitted and hyphen added).

"Minnesota courts apply two different tests in apportioning liability between insurers when the other-insurance clauses conflict: the 'total policy insuring intent' analysis or the 'closer to the risk' analysis." *U.S. Fid. & Guar. Ins. Co. v. Commercial Union Midwest Ins. Co.*, 430 F.3d 929, 934 (8th Cir. 2005) (hyphen added). The policy that is closer to the risk — or whose total insuring intent more fully contemplates the risk — is deemed to provide primary coverage, and the other policy is deemed to provide excess coverage. *Id*. "Where the policies equally contemplate the risk, Minnesota courts pro rate the loss among the applicable policies." *Id*. at 933.

The closeness-to-the-risk analysis examines three factors:

> (1) Which policy specifically described the accident-causing instrumentality?
>
> (2) Which premium is reflective of the greater contemplated exposure?
>
> (3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy — that is, is the coverage of the risk primary in one policy and incidental to the other?

*Hertz Corp. v. State Farm Mut. Ins. Co.*, 573 N.W.2d 686, 691 (Minn. 1998) (quotation omitted).[6] The "total policy insuring intent" analysis involves an examination of "the primary policy risks upon which each policy's premiums were based and the primary function of each policy." *U.S. Fid. & Guar. Ins. Co.*, 430 F.3d at 934 (quotation omitted).

Minnesota courts gamely insist that there is a meaningful difference between the closer-to-the-risk analysis and the total-policy-insuring-intent analysis. Minnesota courts have explained that the total-policy-insuring-intent analysis is in theory broader "in the sense that it involves more than a mechanical application of the three factors" of the closeness-to-the-risk analysis. *N. Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co.*, 634 N.W.2d 216, 223 (Minn. Ct. App. 2001) (quotation omitted). The Court confesses, however, that it has been unable to discern much difference between the tests in practice. As the Minnesota Court of Appeals has admitted, "[t]he analyses are similar under the two tests and often lead to the same result." *Goeman v. Allstate Ins. Co.*, 725 N.W.2d 375, 378 n.1 (Minn. Ct. App. 2006).

In this case, the first factor under the closeness-to-the-risk analysis — which policy specifically described the accident-causing instrumentality? — weighs in favor of neither insurer. Neither policy more specifically describes or contemplates a fire that destroys the strip mall housing ZBA's grocery business.

---

[6]Security National argues for consideration of an additional factor: According to Security National, a policy in which the party seeking indemnification is the primary named insured should be deemed closer to the risk than a policy in which the party seeking indemnification is an additional named insured. (Needless to say, ZBA is the primary named insured under the West Bend policy, but merely an additional named insured under the Security National policy.) Security National's argument has little to recommend it and has already been rejected by the Eighth Circuit. *See U.S. Fid. & Guar. Ins. Co.*, 430 F.3d at 934-35.

The second factor — which premium is reflective of the greater contemplated exposure — is almost impossible to apply to the facts of this case. An apples-to-apples comparison of premiums cannot be made, as the policies provide different coverages and different limits of liability. Zupancich Brothers paid $1,600 to Security National for $1,000,000 of business-income coverage for the Babbitt grocery store. *See* Security National Policy at 39, 55, 57.[7] ZBA paid $2,792 to West Best for $1,349,820 of combined property-damage and business-income coverage for the Babbitt strip mall. *See* West Bend Policy at 6.[8] Thus, although West Bend's premium was higher, West Bend also provided broader coverage and a higher limit of liability. It is therefore impossible to know which premium reflects greater contemplated exposure.

The third factor, however, provides strong evidence that Security National's policy is closer to the risk. Security National's policy is a *grocery-store* policy; it explicitly acknowledges that it covers the income of "supermarkets." Security National Policy at 38 (emphasis omitted). West Bend's policy is a *strip-mall* policy; the policy does not mention supermarkets or grocery stores, and nothing in the policy even hints that ZBA has any business income other than as a lessor of space in the strip mall. In addition, Security National specifically allocated part of the policy's premium to the coverage of lost business income of the Babbitt grocery store. *Id.* at 57. None of the premium for West Bend's policy was specifically

---

[7]Zupancich Brothers paid a total premium of $27,964 to Security National, of which $1,600 was specifically allocated to business-income coverage for the Babbitt store. (The Security National policy also provides business-income insurance for the five other grocery stores owned by Zupancich Brothers and property coverage for the buildings in which four of those stores are located.)

[8]ZBA paid a total premium of $5,715 to West Bend, of which $2,792 was specifically allocated to the strip mall. *See* West Bend Policy at 3, 6. (The West Bend policy also insures several other buildings near the strip mall that are owned by ZBA.)

allocated to coverage of lost business income, much less to coverage of lost business income of a particular grocery store.  An educated layperson who read through the two policies would readily discern that the Security National policy insured the income of the Babbitt grocery store, but would have no inkling that the West Bend policy did likewise.  Without question, then, the third closeness-to-the-risk factor weighs heavily in favor of finding that Security National provides primary coverage for ZBA's lost grocery income.  *See, e.g.*, *Westchester Fire Ins. Co. v. Cont'l Cas. Co.*, No. A05-556, 2006 WL 786866, at *9 (Minn. Ct. App. Mar. 28, 2006); *Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co.*, 567 N.W.2d 71, 81 (Minn. Ct. App. 1997); *Gamble Skogmo, Inc. v. Aetna Cas. & Sur. Co.*, 390 N.W.2d 343, 348 (Minn. Ct. App. 1986).

      The total-policy-insuring-intent analysis points to the same conclusion.  One of the "primary function[s]" of the Security National policy is to provide coverage for lost grocery income, as is evidenced by the policy's explicit reference to such income and the explicit allocation of part of the premium to coverage of such income.  *U.S. Fid. & Guar. Ins. Co.*, 430 F.3d at 934 (quotation omitted); *see also Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82, 86 (Minn. 1988) ("This injury . . . is precisely the type of risk [the insurer] intended to cover . . . .").  Under the West Bend policy, however, coverage for lost grocery income is incidental to the other coverage provided.

      The extrinsic evidence strongly supports the Court's finding that the Security National policy provides primary coverage of the income of the grocery store in Babbitt.  *See Christensen*, 658 N.W.2d at 587 ("[I]n determining which policy is primary, courts may look beyond the language of the policies.").  Three aspects of the extrinsic evidence stand out:

First, it is undisputed that ZBA sought grocery-income coverage from Security National and that Security National knew that it was insuring the income of a grocery store. But there is no evidence that ZBA sought grocery-income coverage from West Bend. *See* Rykken Dep. 40. Indeed, it would have been illogical for ZBA to do so, as ZBA already had ample grocery-income coverage from Security National.

Second, ZBA does not appear to have believed that it had grocery-income coverage from West Bend. After the fire, ZBA asked West Bend to indemnify it for the damage to the strip mall and the loss of rental income, but it asked Security National — and *only* Security National — to indemnify it for the loss of grocery income. The notion that the West Bend policy might cover lost grocery income appears to have first occurred to a claims adjuster at Security National, not to anyone employed by ZBA or by the insurance broker that placed ZBA's coverage.

Third, it appears to be undisputed that West Bend had no idea that it was covering the income of the Babbitt grocery store. If West Bend had known that it was insuring the income of the store, then presumably an underwriter would have done something to underwrite that risk — by, for example, inquiring about the *amount* of that income, so that he or she could have some sense of West Bend's exposure. But West Bend, unlike Security National, did not specifically underwrite ZBA's grocery-store operations. *See* Hall Aff. ¶ 4 [ECF No. 65]; Bonanno Dep. 55-56 [ECF No. 60-7].

In sum, both the insurance policies themselves and the extrinsic evidence make it abundantly clear that Security National provides primary coverage — and West Bend provides excess coverage — for ZBA's lost grocery income. That is true under both the closeness-to-the-

risk analysis and total-policy-insuring-intent analysis. Because ZBA's claim for lost grocery income does not exceed the liability limits of the Security National policy, West Bend is not liable to ZBA. Accordingly, West Bend's motion for summary judgment is granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion for summary judgment of plaintiffs Zup's of Babbitt-Aurora, Inc. and Security National Insurance Co., Inc. [ECF No. 57] is GRANTED IN PART AND DENIED IN PART:

    a. The motion is GRANTED as to West Bend's amended counterclaim. The amended counterclaim [ECF No. 21] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

    b. The motion is DENIED in all other respects.

2. The motion for summary judgment of defendant West Bend Mutual Insurance Co., Inc. [ECF No. 62] is GRANTED. The complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 20, 2014                         s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge